IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

ROBERT HUFFMAN, OBO
KAREN BETH HUFFMAN,

      **Plaintiff,**

vs.                                        CIVIL ACTION NO. 2:16-02594

CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered March 17, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 20 and 23.)

The Plaintiff, Robert Huffman (hereinafter referred to as "Mr. Huffman"), on behalf of his wife, Karen Beth Huffman (hereinafter referred to as "Claimant"), is a substitute party in this matter since her death[1]. Claimant filed an application for DIB and an application for SSI on June

---

[1] The Motion for Substitution of Party with attached Notice of Substitution of Party Upon Death of Claimant were filed on July 5, 2016. (Document No. 11.) The undersigned granted same on July 26, 2016. (Document No. 13.)

25, 2012 alleging disability as of November 1, 2008.[2] (Tr. at 182-186.) Claimant's applications were denied initially on October 26, 2012 (Tr. at 119-123, 124-128.) but upon reconsideration on April 10, 2013, Claimant's SSI claim was allowed with a later onset date of December 5, 2012. (Tr. at 135-136.) Claimant's DIB claim was denied upon reconsideration. (Tr. at 132-134.) On May 24, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ), contesting the later onset date in her SSI claim and the denial of her DIB claim. (Tr. at 137-138.) The hearing was held on July 30, 2014, before the Honorable Sabrina M. Tilley. (Tr. at 26-55.) By decision dated October 29, 2014, the ALJ determined that Claimant had not been under a disability at any time from her amended alleged onset date of August 11, 2011 through December 5, 2012. (Tr. at 8-25.) The ALJ's decision became the final decision of the Commissioner on January 2, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) On March 17, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any

---

[2] Claimant orally amended her alleged onset date at the administrative hearing to August 11, 2011, her fiftieth birthday. (Tr. at 34-36.)

step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the

impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those

sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[3] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4) and 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant met the insured status through June 30, 2012. (Tr. at 13, Finding No. 1.) Next, the ALJ found that Claimant satisfied the first

---

[3] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

inquiry because she had not engaged in substantial gainful activity since the amended alleged onset date, August 11, 2011. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease, calcaneal spurs, diabetes mellitus, peripheral neuropathy, and coronary artery disease. (Id., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 14, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform less than the full range of light work as defined in the Regulations with:

> [L]ifting of 20 pounds occasionally and 10 pounds frequently, standing and walking for two hours in an eight-hour workday, and sitting of at least six hours in an eight-hour workday. She could occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. She should have only occasional exposure to extreme cold, extreme heat, vibrations, and hazards.

(Tr. at 15, Finding No. 5.) At step four, the ALJ found that Claimant was unable to perform past relevant work. (Tr. at 19, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was 50 years old as of the amended alleged onset date of disability, which is defined as an individual closely approaching advanced age. (Id. at Finding No. 7.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id. at Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Tr. at 20, Finding Nos. 9, 10.) On this basis, benefits were denied. (Tr. at 21, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Issues on Appeal</u>

The questions presented in this case are: (1) Whether the ALJ erred in failing to consider evidence after Claimant's date of last insured ("DLI"), specifically with respect to Claimant's mental impairments; and (2) Whether the vocational expert's testimony was insufficient to establish substantial evidence at the ALJ's step five finding that Claimant could perform other work that exists in significant numbers in the national economy. (Document No. 20 at 7.)

<u>Claimant's Background</u>

Claimant was born on August 12, 1961, and was 50 years old and considered closely approaching advanced age at the time of the administrative hearing. <u>See</u> 20 C.F.R. §§ 404.1563(d),

416.963(d). (Tr. at 36.) Claimant had problems with her memory, and could not recall details of her medical conditions[4], therefore, her husband, Mr. Huffman, testified on her behalf at the administrative hearing. (Tr. at 34-35.) She previously worked as a care giver for mentally disabled individuals, as a cashier, and in computer processing for a bank. (Tr. at 62, 216-220.) She attended Charlestown High School, but received her G.E.D. as opposed to a diploma (Tr. at 486.) and later graduated from West Virginia State University with a degree in Applied Science. (Id.)

The Relevant Evidence of Record[5]

On February 19, 2008, Claimant underwent an EMG due to leg pain and "foot drop on the right side that improved" (Tr. at 350.) It was noted that Claimant had "mild axonal type of peripheral neuropathy, most likely due to diabetes." (Tr. at 352.) On November 6, 2008, Claimant was prescribed Lyrica (Tr. at 608.), when that was found to be of no help, by July 20, 2009, she was prescribed Neurontin (Tr. at 600.); she was also given a prescription for compression stockings to be worn during the day and to elevate her legs during the evening and at night regarding her "venous insufficiency/reflux." (Tr. at 601.) Due to her complaints of pain in her right foot and ankle, x-rays taken on July 22, 2009 indicated that Claimant had a "large calcaneal spur". (Tr. at 334, 337.) On August 13, 2009, venous mapping of her legs showed "Patent greater saphenous vein, significant reflux noted in common femoral vein, and significant reflux noted in femoral vein. Significant reflux in Left Greater Saphenous Vein." (Tr. at 322.)

On June 6, 2011, Claimant was seen at Cabin Creek Health Systems for follow-up on her

---

[4] Claimant recalled that her disability began with drop foot which caused her to stumble, so she "rode the wall to get from place to place"; all she could remember was that she was diagnosed with neuropathy and had uncontrolled blood sugars. (Tr. at 39.)
[5] Because Claimant's appeal only concerns the ALJ's treatment of her mental impairments, the undersigned focuses on the relevant evidence of record pertaining to same as referenced by the parties in their respective pleadings.

diabetes; it was noted she was not compliant with treatment. (Tr. at 560.) She was continued on Lortab and Neurontin for peripheral neuropathy, and her hypertension was reported stable on medication. (Id.) Claimant's mental status was reported normal, "alert" and "oriented x3". (Id.)

On July 20, 2011, Claimant was taking oral medications (Actos, Metformin and Janumet) for diabetes, and she reported she took Lortab for neuropathy and that her blood sugars had been better since restarting her diabetic medication, after having been out of medication for more than a month. (Tr. at 557.) Her mental status was normal, and she was oriented to person, place and time. (Id.) On July 29, 2011, a left knee x-ray taken at CAMC showed minimal osteophyte formation off the medial and patella-femoral compartments. (Tr. at 286.) On that same date, her doctor noted in that she had had edema in her legs for months, and that she had knee pain. (Tr. at 555.)

Claimant's medical "problem list" as of August 8, 2011 included neuropathy of both feet, right calcaneal heel spur, and venous insufficiency, left saphenous vein graft. (Tr. at 550.) However, her diabetes was stable because she was following a diet. (Tr. at 551.) On August 11, 2011, an MRI of her left knee showed no fractures or other abnormalities. (Tr. at 281.) On August 15, 2011, her blood sugars were described as stable again because she was doing much better with her diet. (Tr. at 548.) Claimant reported edema in her legs and ankles at the end of the day, but her knee pain had resolved. (Id.) Her mental status was normal and she was oriented to person, place and time. (Tr. at 549.) However, by December 9, 2011, Claimant reported to her doctor that the pain in her legs was worsening, that she felt that Neurontin was not helping, and that Lortab was more effective. (Tr. at 545.) She stated that she checked her glucose once a day and taking her medication as prescribed, but was not following the diabetic diet or exercising. (Id.)

A follow-up examination on January 20, 2012 indicated that Claimant had no edema in her extremities, her reflexes and gait were normal, and she was able to squat and arise from a squat without difficulty. (Tr. at 543.) Though she was not following the diabetic diet, she checked her blood sugars and had no hypoglycemic episodes. (Tr. at 542.) The diet was "discussed in depth" and she was encouraged to exercise and to continue to take her medications. (Tr. at 543.)

An MRI of her lumbar spine on February 29, 2012, revealed minimal degenerative changes at disc level L5-S1 and a subtle right paracentral disc protrusion at L5-S1. (Tr. at 276.)

In April 2012, Claimant began new medications for diabetes, and her blood glucose levels improved. (Tr. at 535.) By May 2012, she was checking her blood sugars twice daily and felt her glucose levels improved. (Tr. at 532.) She began exercising on an elliptical machine, and was trying to follow a healthy diet. (Id.) In July 2012, Claimant was noted to have received treatment for a urinary tract infection, which had resolved, and diabetic ketoacidosis, which had also resolved. (Tr. at 533.) In August 2012, Claimant reported that her blood sugars averaged between 140 and 200, and that she was doing better since starting back on NovoLog insulin. (Tr. at 527.)

On October 9, 2012, Claimant sought treatment from Dr. Darshan Dave for memory loss[6], which had occurred "[o]ver several months." (Tr. at 695.) It was noted that Claimant's long term memory was intact, but she was "forgetful short term." (Id.) Her mental status examination revealed that her memory, attention span and concentration were normal. (Tr. at 695-696.) Her orientation, fund of knowledge and language were normal. (Tr. at 696.) EEG studies performed on October 23, 2012 were normal. (Tr. at 467.) By December 20, 2012, Claimant still complained of

---

[6] Claimant also sought treatment for numbness in her hands and feet; a nerve conduction study on October 18, 2012 indicated "mild to moderate median neuropathy suggestive of carpal tunnel syndrome mild sensory motor axonal polyneuropathy." (Tr. at 700.)

memory loss, however due to the normal EEG and no abnormalities seen in an MRI of her brain,
Dr. Dave noted her "low normal" B12 levels and suggested she supplement same "in light of
memory loss and neuropathy." (Tr. at 701-702.) On January 15, 2013, Claimant started receiving
B12 injections, every two weeks, and then once monthly, per Dr. Dave's recommendation. (Tr. at
506.)

      State agency Psychological Examiner:

      On March 5, 2013, Kay Collins-Ballina, M.A. performed a clinical interview and a mental
status examination of Claimant. (Tr. at 485-490.) The only records available to Ms. Collins-Ballina
were the disability application form. (Tr. at 486.) Claimant's husband was the primary source of
information during the interview. (Tr. at 485-486.) Mr. Huffman stated that Claimant was applying
for benefits because she had "bad health problems", including neuropathy, restless leg syndrome,
a heart murmur, high cholesterol and high blood pressure. (Tr. at 485.) He reported "that within
the last six months, her condition has worsened." (Tr. at 487.) Claimant's "husband does the
cooking and cleaning of the house; she required assistance with bathing, getting in shower, putting
on her clothes, and standing up." (Id.)

      Claimant reported a nervous mood during the interview, and having a bad mood during the
past two weeks. (Tr. at 486.) She said that she cried frequently and slept sporadically. (Id.) Her
mood was anxious, depressed and tearful at times during the interview; her affect was restricted,
although her speech and though processes were logical and coherent. (Tr. at 487.) Ms. Collins-
Ballina found that Claimant's immediate memory was moderately deficient, her delayed memory
was severely deficient, and her attention/concentration were markedly deficient. (Id.) She began
crying during the interview and was unable to continue. (Id.) Ms. Collins-Ballina diagnosed

11

Claimant with anxiety disorder, NOS, and cognitive disorder, NOS. (Tr. at 488.) Part of the basis

for the diagnosis of cognitive disorder Claimant's difficulties in recalling general questions such

as her current age and the month. (Id.) Ms. Collins-Ballina also found that Claimant's persistence

and pace were mildly deficient/slowed and that she was likely not capable of managing her own

benefits without supervision if benefits were awarded. (Id.) She opined that Claimant's long-term

prognosis was good with treatment and intervention. (Id.)

State Agency Physician and Psychologist Consultants:

On February 21, 2013, Dr. Fulvio Franyutti reviewed the evidence of record and concluded

that there was insufficient medical evidence to determine Claimant's physical RFC through her

date last insured (June 30, 2012). (Tr. at 107-108.) On March 29, 2013, Karl G. Hursey, Ph.D.

reviewed the evidence of record and also concluded that there was insufficient medical evidence

to determine Claimant's mental RFC through her date last insured. (Tr. at 108-109.) The medical

evidence of record reviewed by Drs. Franyutti and Hursey included the following: Cabin Creek

Health Center records received on November 26, 2012 and July 6, 2012 (Tr. at 90, 91, 105, 106.);

CAMC outpatient/clinic records received on August 8, 2012, August 6, 2012, August 3, 2012, and

August 1, 2012 (Tr. at 90-91, 105-106.); CAMC inpatient/er records received on July 19, 2012

(Tr. at 91, 106.); and Claimant's Function Reports, Pain Questionnaires and Work History. (Tr. at

89, 90, 104, 105.) Dr. Hursey also reviewed the consultative examination report by Kay Collins-

Ballina, M.A., received on March 28, 2013. (Tr. at 89, 104.)

In terms of Claimant's physical RFC evaluation, Dr. Franyutti completed an assessment

finding that she was capable of light exertion work, standing, and walking for two hours in an

eight-hour day, with occasional climbing of ramps and stairs, no climbing of ladders, ropes, and

scaffolds, occasional balancing, stooping, kneeling, crouching and crawling, and only occasional exposure to extreme cold, heat, and hazards. (Tr. at 111-112.) In terms of Claimant's mental RFC evaluation, Dr. Hursey found Claimant had marked functional limitations, and did not retain the capacity to complete work-related activity. (Tr. at 99, 114.) Dr. Hursey provided a summary of his opinion, "[b]ased on the MER, Clmt shows some marked functional limitations d/t mental/emotional factors . . . It appears that Clmt does NOT retain the mental/emotional capacity to complete work-related activity in a manner consistent with SGA. Thus Clmt is a vocational allowance." (Tr. at 99, 114.) It was further noted that "[c]onsideration for estimated onset date: 12/05/2012, three months prior to CE. Cognitive difficulties were not as severe 6 months ago per spouse began to be a problem than [*sic*] and are reported to continue to have increased over the past 6 months." (Id.)

The Administrative Hearing

    Mr. Huffman's Testimony:

    Mr. Huffman testified that his wife had drop foot in 2011. (Tr. at 40.) He stated that she "would be walking along and then all of a sudden her foot would give out from under her" and he would have to grab her or she would fall. (Id.) He stated that she did fall a lot. (Tr. at 41.) He testified that Claimant had trouble with her diabetes during that time also. (Id.) He stated that she had gone into ketoacidosis and that she had been in the ICU due to ketoacidosis in the past, the last time being around the time she turned fifty. (Id.)

    Mr. Huffman testified that Claimant was not working in 2011, and she was unable to do things she did before because of her symptoms. (Tr. at 43.) He stated that her health issues had gotten progressively worse. (Id.) Mr. Huffman testified that Claimant was still doing things around

the house, but when her legs gave out, she had to grab something or "she'd go all the way down". (Tr. at 44.) He estimated that her legs gave out on her while doing something about three times a week. (Id.) He stated that she did not use a cane at that time. (Tr. at 45.)

 Mr. Huffman testified that he and his wife still did things such as going to the grocery store in 2011, but if they were in the grocery store and her leg started giving her trouble, he would go get a buggy so she could ride or she would walk holding onto him. (Id.) He stated that he always carried the groceries into the house. (Id.) He testified that his wife could lift a gallon of milk to cook. (Id.) He stated that she took breaks during the day while doing activities around the house. (Tr. at 46.) At that time, Mr. Huffman testified that Claimant got up for the day at 8 am or 9 am. (Id.) He stated she then might clean the kitchen and take a break, then do another room and then sit and rest. (Id.) He stated she did not have hobbies at that time. (Id.)

 Mr. Huffman testified that he and his wife had gone to visit people in the past, but then she just quit going because she did not want people to see her legs going out from under her. (Id.) He stated that she had pain in her right foot and up the back part of her right leg and into her knee, but in 2011 they thought she would get better. (Tr. at 47.) Then she started having pain in her left leg, too. (Id.) Her pain got worse, then she found out she had neuropathy. (Id.)

 <u>Vocational Expert (VE) Cecelia Thomas Testimony:</u>

 The VE testified that Claimant's past work as cashier in a grocery store was light and low semi-skilled; her work as a home attendant was light and semi-skilled; and her work as a processor at a bank was sedentary and semi-skilled, but light as she performed it. (Tr. at 48-49.)

 The ALJ asked the VE to assume an individual of the same age, education, and work history as Claimant, who was capable of lifting twenty pounds occasionally and ten pounds frequently;

who could stand and walk two hours in an eight hour day; who could sit at least six hours in an eight hour day; who could occasionally climb ramps or stairs; who could never climb ladders, ropes, and scaffolds; who could occasionally balance, stoop, kneel, crouch and crawl; and who could have only occasional exposure to extreme cold, extreme heat, vibrations, and hazards. (Tr. at 50-51.) The ALJ then asked the VE whether the above individual could perform any of Claimant's past work; the VE testified that the individual could not do those past jobs. (Tr. at 51.)

The VE testified that the above described individual could perform a reduced range of light work and identified as possible jobs about ten percent of the total pool of cashier type positions; she testified that there were a total of 3,314,000 of those positions nationally and 430,000 regionally (the region being the states of West Virginia, Virginia, Ohio, Kentucky, and Pennsylvania). (Tr. at 51-52.) The VE testified that the individual could also perform the job of a companion or sitter for an elderly person but only about half the total jobs would be performable with sitting/standing flexibility; she stated that the total number of such jobs was 820,000 nationally and 83,000 regionally. (Tr. at 52.) The VE stated that the individual could also perform the twenty-five percent of the jobs of non-postal clerk of which there were a total of 102,000 nationally and 17,000 regionally. (Tr. at 52-53.)

As to the total number of jobs available, the VE testified that there was "not really any reliable way that I'm aware of to weed these out". (Tr. at 53.) She agreed with the ALJ that she was basing her answers on her experiences as best she could. (Id.) She also agreed that her testimony was "consistent with the DOT pretty much". (Id.) The VE testified that none of Claimant's past jobs would have allowed her to acquire skills transferable to a sedentary level position. (Id.)

Claimant's Challenges to the Commissioner's Decision

First, Claimant argues the ALJ found her mental impairments non-severe, and found mild restrictions in her activities of daily living, social functioning, concentration persistence or pace, with no repeated episodes of decompensation without performing the "special technique" required by the Regulations and provided no explanation for her conclusions with respect Claimant's cognitive, memory or social problems. (Document No. 20 at 8-10.) Claimant points out the paucity of case law within the Fourth Circuit addressing an ALJ's failure to comply with 20 C.F.R. § 404.1520a necessitates remand, and that other Circuits are split on the issue. (Id. at 10.) Because the ALJ gave only conclusory statements regarding Claimant's mental impairments, Claimant argues meaningful judicial review is impossible. (Id. at 11.)

Next, Claimant argues that the ALJ did not consider any of the post DLI evidence related back to her mental impairments prior to her DLI. (Id.) Claimant argues that the SSA did not provide her a psychological evaluation until after her claims were denied initially, and after her DLI. (Id.) Claimant takes issue with the State agency non-examiner estimated onset date of December 5, 2012 because it was based on statements Mr. Huffman made during the interview with Ms. Collins-Ballina when it was unclear which of Claimant's "conditions" he referenced. (Id. at 12.) Claimant contends that the timing of her psychological evaluation was beyond her control, but disputes the estimated onset date provided by Dr. Hursey when certain medical evidence indicated that she had mental health problems since July 2012.[7] (Id. at 12-13.) Claimant cites Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 340 (4th Cir. 2012) in support of her argument that "post-DLI medical evidence generally is admissible in an SSA disability determination in such instances in which that

---

[7] Claimant references a Comprehensive Psychiatric Evaluation dated July 10, 2013 from Process Strategies. (Tr. at 646-648.)

evidence permits an inference of linkage with the claimant's pre-DLI condition." <u>Id</u>. at 340-341. Because the ALJ failed to consider Claimant's post-DLI evidence indicating her mental impairments manifested prior to the estimated onset date provided by Dr. Hursey, the decision is not supported by substantial evidence. (<u>Id</u>. at 13.)

Finally, Claimant argues that the testimony provided by the VE in response to the ALJ's hypothetical failed to account for Claimant's non-severe mental impairments, thus the ALJ's reliance on the VE's testimony was not supported by substantial evidence pursuant to <u>Walker v. Bowen</u>, 889 F.2d 47, 50-51 (4th Cir. 1989). (<u>Id</u>. at 14.) Claimant also contends that the VE's testimony was unreliable insofar as the number of jobs in the economy which Claimant could perform, therefore, the ALJ neglected her duty to ensure the VE's opinion complied with the DOT. <u>See</u> <u>Pearson v. Colvin</u>, 810 F.3d 204 (4th Cir. 2015). (<u>Id</u>. at 15.)

In response, the Commissioner agrees with Claimant that post-DLI evidence is generally admissible, however, contends that the ALJ did not err in in finding Claimant's post DLI mental impairments were non-severe, or in performing the "special technique" for same because there was very little evidence that Claimant had a mental impairment prior to December 5, 2012. (Document No. 23 at 8-10.) Further, Claimant's representative did not dispute this issue before the ALJ or ask the VE additional questions at the hearing that concerned Claimant's post-DLI mental impairments, which acts as a waiver for this argument.[8] (<u>Id</u>. at 9.) Moreover, Claimant's representative agreed with the ALJ at the hearing that there was hardly any medical evidence of

---

[8] In Claimant's Reply to this argument (Document No. 24 at 1-2.), she correctly notes that claimants are not required to exhaust issues in a request for review by the Appeals Council, as she timely raised the issue before the District Court level and not for the first time at the Circuit level. <u>Sims v. Apfel</u>, 530 U.S. 103 (2000). Accordingly, the undersigned will address the arguments Claimant raised on appeal herein, and will not address the Commissioner's waiver argument because same is inapposite in this case.

record concerning Claimant's mental impairments prior to the estimated onset date, December 5, 2012. (Id. at 10-11.) The Commissioner also argues that the Bird case is factually distinguishable from the matter at bar; there is evidence in Claimant's case that indicated her mental status was normal prior to her DLI, and the ALJ cited the medical evidence that she had no severe mental impairments prior to her DLI. (Id. at 13-14.)

The Commissioner also argues that the VE's testimony was reliable, and that it is up to the ALJ to resolve any conflicts between a VE's opinion and the DOT; the Fourth Circuit limited its holding to only "apparent conflicts", and does not mean the ultimate determination was not based on substantial evidence. (Id. at 14.) The VE's testimony concerning the number of jobs available in the regional economy in this case was significant. (Id. at 15.)

In reply, Claimant argues that she did not waive any issues as they were raised prior to the Appeals level, and that the Appeals Council is required to review the entire record for defects under the Regulations. (Document No. 24 at 1-2.) Claimant further contends that the ALJ did not provide adequate explanation for her findings regarding Claimant's mental impairments, and deprives this Court of meaningful review, necessitating remand. (Id. at 2.) Finally, Claimant restates her position that the VE's testimony was not reliable, and the number of jobs available based on the VE's uncertain testimony does not provide the substantial evidence for the ALJ's step five finding; remand is the only cure for the defects in the ALJ's decision. (Id. at 3-4.)

Analysis

The ALJ's Decision Regarding Claimant's Mental Impairments:

The ALJ found no evidence that Claimant had a severe mental impairment prior to

December 5, 2012[9] based on the following: the June 6, 2011 Cabin Creek Health Center record indicated normal mental health status; the October 9, 2012 Dr. Dave record noted her complaints of memory loss, although an examination of same revealed it was normal and that her attention span and concentration was normal; the December 29, 2012 EEG was normal; and the March 5, 2013 Collins-Ballina evaluation assessed anxiety disorder, NOS and cognitive disorder. (Tr. at 14.) The ALJ then found Claimant had mild difficulties in first three functioning areas and no evidence of repeated episodes of decompensation. (Id.) The ALJ further noted that in the area of activities of daily living, Claimant's Function Report revealed that she took care of her pets, prepared her own meals, load the dishwasher, went to her doctor appointments, shopped, read, watched television, visited with family, talked on the phone, and used the computer. (Tr. at 18.) The ALJ found Claimant's allegations of being totally disabled inconsistent with the list of activities she was able to do as contained her Function Report. (Id.) The ALJ explicitly gave "great weight" to Dr. Hursey's March 29, 2013 opinion that there was insufficient evidence to assess Claimant's mental condition prior to June 30, 2012 (her DLI) and found it consistent with her finding of no severe mental impairment prior to this date. (Tr. at 19.)

The Bird Court recognized that retrospective consideration of evidence created after a claimant's DLI "is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with [her] earlier symptoms." 699 F.3d at 342 (quoting Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969). In Bird, the claimant alleged symptoms of post-

---

[9] Claimant states that Dr. Hursey took "artistic license" or psychological license" with his interpretation of Ms. Collins-Ballina's report with reference to Mr. Huffman's statements during the interview as to when Claimant's condition worsened. (Document No. 20 at 12.) Claimant appears to speculate that it "seems unlikely that [Claimant's] cognitive impairment developed so rapidly" and points to the treatment notes from Dr. Dave suggesting that this specific impairment had been in existence prior to December 5, 2012. (Id.) The undersigned addresses the evidence regarding Claimant's mental impairments and her argument concerning the estimated onset date infra.

19

traumatic stress disorder (PTSD), but had no medical records dating before his DLI. However, the claimant had received a post-DLI favorable disability rating due to PTSD from the Department of Veterans Affairs (VA) based on psychologist reports that the claimant was disabled. The case at bar differs insofar as there are some medical records concerning Claimant's mental health prior to her amended alleged onset date of August 11, 2011, and prior to the established onset date of December 5, 2012; the ALJ herein referenced same in her decision as noted *supra*.

Claimant contends that she had cognitive problems before her DLI that persisted afterwards and referenced several instances in the record supporting this, "(See, e.g. Tr. 227, 235, 237, 238, 239, 240, 242 and 695-701)". (Document No. 20 at 11.) The undersigned notes that these records contain the following: Disability – Appeal Form, dated November 7, 2012, Claimant stated that she "[n]eeds reminders to do everything" (Tr. at 227.); Function Report – Adult, dated November 23, 2012, Claimant stated that she has "trouble remembering (to take meds, where I've put things, if I've eaten, etc.)", that she needs reminders of her personal needs, such as grooming or testing her sugar levels, that she has to make a list for grocery shopping or she will forget what she needs, that she forgets how much money she has spent, that she must read things over several times, that she cannot focus or retain information very well, that she has mood swings and snaps at people for no reason, and that she had trouble remembering how to get to places, or where the car was parked (Tr. at 235, 237-240, 242.); and treatment notes from Dr. Dave dated October 9, 2012 through December 20, 2012, wherein Claimant complained of memory loss. (Tr. at 695-701.)

Claimant argued that her mental health problems had been present for a year, "since at least July 10, 2012" and cited the July 10, 2013 "Comprehensive Psychiatric Evaluation" from Process Strategies. (Document No. 20 at 12-13; Tr. at 646-648.) Although Claimant provided a history that

she experienced "panic episodes with development of severe agoraphobia during the past year" (Tr. at 646.), there is no other medical evidence of this mental health history, except for those referenced *supra*. Though not addressed in the written decision, Exhibit 8F is referenced as one of the numerous medical records of evidence before the ALJ; this Exhibit pertains to treatment records from Process Strategies dated November 13, 2013 through May 22, 2014 with regard to Claimant's continuing treatment for her anxiety and mood disorders. (Tr. at 681-694.) Notably, these records indicate that Claimant's cognition was unimpaired and her mental status examinations were generally normal, including recent and remote memories, and attention/concentration. (Tr. at 683.) It is also notable that the testimonial evidence during the administrative hearing did not include information concerning Claimant's cognitive issues prior to her DLI or on her amended alleged onset date.

Pursuant to 20 C.F.R. §§ 404.1520b(c)(3), 416.920b(c)(3), the SSA may have a claimant undergo a consultative examination should the medical evidence of record be insufficient or inconsistent. Sections 404.1520b(d) and 416.920b(d) also provide that "[w]hen there are inconsistencies in the evidence that we cannot resolve or when, despite efforts to obtain additional evidence, the evidence is insufficient to determine whether you are disabled, we will make a determination or decision based on the evidence we have." Though Claimant argued that she had mental health issues for a year prior to her initial intake interview on July 10, 2013 at Process Strategies, there are no objective medical records that support a finding that she had severe mental impairments prior to her DLI of June 30, 2012, even given the most liberal interpretation of <u>Bird</u> with regard to Claimant's post-DLI evidence.

There is no dispute that Claimant alleged cognitive issues, particularly with memory, but due to the insufficient medical evidence of record pertaining to these impairments prior to June 30, 2012, Claimant was referred for an evaluation by Ms. Collins-Ballina on March 3, 2013. Ultimately, upon reconsideration, Claimant was found disabled as a result of mental impairments with an estimated onset date of December 5, 2012 by Dr. Hursey, based on his review of the medical evidence record. Under the relevant Regulations, the undersigned does not find error with the ALJ's reliance on Dr. Hursey's opinion given the circumstances in this case. Moreover, the ALJ's reliance on Dr. Hursey's estimated onset date of December 5, 2012 is appropriate under the auspices of Bailey v. Chater, 68 F.3d 75, 79 (4th Cir. 1995), wherein the Fourth Circuit, citing SSR 83–20, found:

> The Ruling's language does not expressly mandate that the ALJ consult a medical advisor in every case where the onset of disability must be inferred. Nevertheless, if the evidence of onset is ambiguous, the ALJ must procure the assistance of a medical advisor in order to render the informed judgment that the Ruling requires. Spellman v. Shalala, 1 F.3d 357, 362–63 (5th Cir. 1993); Morgan v. Sullivan, 945 F.2d 1079, 1082–83 (9th Cir. 1991); see Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989); but see Pugh v. Bowen, 870 F.2d 1271, 1278 n. 9 (7th Cir. 1989) (medical advisor was unnecessary where the ALJ had a complete medical chronology of the claimant's condition throughout the relevant time period).

In Bailey, the Court concluded that "[i]n the absence of clear evidence demonstrating the progression of [claimant's] condition, the ALJ did not have the discretion to forgo consultation with a medical advisor." Id. The Court stated that "[t]he requirement that, in all but the most plain cases, a medical advisor be consulted prior to inferring an onset date is merely a variation on the most pervasive theme in administrative law – that substantial evidence support an agency's decisions." Id. at 80. (citations omitted). With respect to Claimant's alleged mental impairments, this case is far removed from the "most plain cases", therefore, Dr. Hursey, a

State agency psychological consultant, provided the substantial evidence required to support the estimated onset date of Claimant's mental impairment.

Further, there is no indication that the ALJ failed to consider post-DLI evidence that Claimant had severe mental impairments pre-dating her DLI, because the record simply lacks such evidence. Though the ALJ gave a concise finding that Claimant's activities of daily living, maintaining social functioning, maintaining concentration, persistence, and pace were mildly restricted based on the aforementioned evidence, there is not much in the way the ALJ could have explained her reasoning, based on the lack of evidence supporting Claimant's alleged severe mental impairments from August 11, 2011 through December 5, 2012. Accordingly, the undersigned finds that Claimant's argument to the contrary lacks merit.

The VE Testimony:

Another question presented is whether the omission of Claimant's non-severe mental impairments from the hypothetical posed to the VE was improper under Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). The Fourth Circuit has held that a VE's opinion is "relevant or helpful" if it is "based upon a consideration of all other evidence in the record", and is given "in response to proper hypothetical questions which fairly set out all of a claimant's impairments." (Id.) It is important to examine the hypothetical that caused remand in the Walker case[10]:

> The [vocational] expert testified that the claimant's former employment as a bricklayer gave him two transferable skills—the ability to use small tools and a knowledge of construction principles. He testified that these skills would be transferable to jobs such as termite treater, termite treater helper, surveyor helper or drywall applicator. The vocational expert testified that these jobs required light or medium exertion.
>
> The ALJ then asked the following questions of the vocational expert:

---

[10] The Court noted that the vocational expert was called to testify primarily about the claimant's transferable skills, a critical issue to the disability determination due to the claimant's "advanced age" status. Id., n.2.

Q:    If Mr. Walker was limited to [per]forming sedentary work, would he be able to transfer any of the prior skills to any sedentary jobs?

A:    The ability to use small tools would be transferable ... to jobs that are in bulk called assembly jobs. Assemblers—there are about 1,400 such jobs in the City of Richmond. About 20,000 throughout the State of Virginia. These are jobs where people use small tools to assemble in some cases automobile parts, parts dealing with electrical appliances such as fans, and other small items.

———————————————

Q:    Mr. Walker has told us about a number of health problems that cause him functional limitations and subjective distress, too. If I found all of his testimony to be credible and supported by the medical evidence, how would that affect his ability to do the types of jobs you've discussed with me.

A:    In my opinion ... it would effectively preclude him from doing any of the jobs that I've enumerated.

The Court found that these questions were improper; there was no indication that the vocational expert knew about the claimant's abilities and limitations, therefore, those answers were deemed "not particularly useful." Id. at 50-51. Moreover, the Court found that the ALJ therein improperly evaluated the claimant's complaints of pain, and did not evaluate the effect of the alleged pain in the RFC, which rendered the ALJ's decision that the claimant had the capacity for the full range of sedentary and light work was not significantly compromised by any non-exertional limitations. Id., See also, Rogers v. Colvin, 2015 WL 1482014, at *10 (S.D.W. Va. Jan. 30, 2015).

In this case, the RFC described above provided the controlling hypothetical to the VE including Claimant's abilities and limitations with respect to sitting and standing in an eight-hour work day, as well as postural and environmental restrictions, in addition to her age, education and work history.[11] (Tr. at 50.) The VE found that such limitations ruled out Claimant's past work, but

_____

[11] It is noted that the ALJ's physical residual functional capacity assessment was based on the completed physical RFC form by Dr. Fulvio Franyutti on February 21, 2013, however, the ALJ excluded the limitations he found regarding fumes, odors, dusts, gases, and poor ventilation due to her finding such limitations were not supported by the evidence of record. (Tr. at 18.)

allowed for a reduced range of light work. (Tr. at 51.) A hypothetical question will be "unimpeachable if it adequately reflects a residual functional capacity for which the ALJ had *sufficient* evidence." <u>Fisher v. Barnhart</u>, 181 Fed.Appx. 359, 364 (4th Cir. 2006) (citing <u>Johnson v. Barnhart</u>, 434 F.3d 650, 659 (4th Cir. 2005)) (internal quotation marks omitted) (emphasis added); <u>see also</u> <u>Russell v. Barnhart</u>, 58 Fed.Appx. 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record"). Based on the ALJ's finding that Claimant's mental impairments were non-severe during the period of time in question, from August 11, 2011 through December 5, 2012, due in part to the paucity of evidence of same, the ALJ '*fairly* set out all of Claimant's impairments' in her hypothetical to the VE as required under <u>Walker v. Bowen</u>, 889 F.2d at 50. (emphasis added.)

With regard to Claimant's next assignment of error, that the VE's testimony was unreliable with respect to the number of jobs available in the economy, and that the ALJ erred in relying on same (Document No. 20 at 14-15.), the undersigned notes the pertinent colloquy went as follows:

Q     Would there be any light other jobs that you could find?

******

A     About, a reduced range of light essentially, I think we could look at things like cashier type positions. About 10 percent of the total pool, at this point I can't factor in the math but the total pool is 3,314,000 nationally and an estimated 430,000 regionally.

Q     Okay, I'm sorry, would you help me with that again.

A     About 10 percent of both of these.

Q     Ten percent of, and your numbers were, I'm sorry.

A     Three million, three hundred fourteen thousand nationally and an estimated 430,000 regionally. Looking at a region including West Virginia, Virginia, Ohio, Kentucky, Pennsylvania. A representative DOT 211.462-010. I would look at comparable positions at rest care at Shawnee Hills, something like a companion, sitter type position with an elderly individual. . . . About half of the jobs I think would allow for the sitting and standing flexibility that we're looking here. . . . But those number an estimated total, an

estimated 820,000 nationally, an estimated 83,000 regionally. But about, I would reduce them by about half.

(Tr. at 51-52.)

*****

A    A representative DOT of 309.677-010. Look at mailroom clerk positions, opening and sorting mail. These are not postal positions but individuals that would work in a private enterprise. Because we have a limited capacity standing and walking I would reduce these jobs by around 75 percent. They number in total an estimated 102,000 nationally, and estimated 17,000 regionally. A representative DOT of 209.687-026. And of course these would just be representative of positions we would consider considering your hypothetical.

Q    Okay. And so you would guestimate say around close to 25,000 nationally for instance?

A    Roughly, your honor.

Q    Roughly.

A    There isn't really any reliable way that I'm aware of to weed these out.

Q    Sure, but based on your experience.

A    I'm doing it the best I can based on my experience.

Q    Excellent. And you're consistent with the DOT pretty much?

A    Yes, ma'am.

(Tr. at 52-53.)

That exchange is the gravamen of Claimant's contention that the VE's opinion testimony was unreliable, and that the ALJ's acceptance of her responses to the controlling hypothetical amounted to a dereliction in her affirmative duties to ensure that the VE's answers were consistent with the Dictionary of Occupational Titles ("DOT"). Claimant and the Commissioner disagree over whether these responses to the ALJ's hypothetical were "apparent conflicts" with the DOT, thus necessitating the ALJ's resolution of same at the hearing. Social Security Ruling 00-4p requires an ALJ to identify and obtain a reasonable explanation for any conflicts between a vocational expert's testimony and the DOT, as well as explain in the decision how any conflict that was identified was resolved. 2000 WL 18998704, at *1. The Fourth Circuit has determined

that an ALJ has not fulfilled his affirmative duty as described in SSR 00-4p when a vocational expert responds with a simple "yes" when asked if her testimony is consistent with the DOT; an ALJ is expected to elicit an explanation if there is an "apparent conflict". Pearson v. Colvin, 810 F.3d 204, 208 (4th Cir. 2015). "The 'apparent' conflict standard . . . embraces the reality that, in many cases, testimony may only appear to conflict with the [DOT], and the vocational expert may be able to explain that, in fact, no conflict exists." Id. at 209-210. In Pearson, the apparent conflict causing remand concerned a question as to whether the claimant could perform other jobs that entailed bilateral overhead reaching, when the ALJ limited him to occasional overhead reaching with his non-dominant arm. The DOT provides a broad definition of "reaching", which necessitated the ALJ to inquire of the vocational expert further to determine if the claimant actually could perform other work or was disabled.

In this case, the question is whether the ALJ's use of the word "pretty much" and the VE's "guestimate" of the number of jobs that were "roughly" available nationally and regionally due to her having "no reliable" method to pare down the number of jobs to accommodate Claimant's capacity to sit for six hours and stand and walk for two hours in an eight-hour day, are "apparent conflicts" as defined by SSR 00-4p. An ALJ may not rely on evidence provided by a vocational expert or other reliable source of occupational information if that evidence is based on underlying assumptions or definitions that are inconsistent with SSA policies or definitions. See, SSR 00-4p, 2000 WL 1898704, at *3. The Ruling provides examples of such conflicts, for instance, if a vocational expert's testimony establishes exertional demands of a category of work beyond a claimant's "light" work capabilities, that includes occupations in the medium work category, then an ALJ cannot rely upon that testimony. Id. Further, an ALJ has a duty to obtain "reasonable

explanations" for apparent conflicts between a vocational expert's testimony and the DOT. Id. at
*4. In the matter at bar, the argument over the aforementioned terms used by the ALJ and the VE
during the hearing appear to be more form over substance; there has not been any evidence shown
that the types of jobs the VE opined Claimant was capable of performing conflicted with the DOT.
The VE gave answers to the ALJ's questions, "based on [her] experience", and provided "rough[]"
estimates of the number of jobs available in accordance with the restrictions posed in the
hypothetical. The undersigned is of the opinion that such responses are "reasonable" under the
circumstances as well as the Social Security Ruling. Claimant's argument on this issue is akin to
"nitpick[ing] an ALJ's or [vocational] expert's word choice on appeal" despite no other evidence
suggesting an "apparent conflict" in the testimony envisioned by the Court. Pearson, 810 F.3d at
209. Accordingly, the undersigned finds that the VE's testimony, and the ALJ's reliance upon
same, was based upon substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District
Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court
**DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 20.), **GRANT** the
Defendant's Motion for Judgment on the Pleadings (Document No. 23.), and **AFFIRM** the final
decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby
**FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District
Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules
6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of
objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 14, 2016.

Omar J. Aboulhosn
United States Magistrate Judge

29